IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

EUNICE JENKINS,

               Plaintiff,

    v.

INSPIRA HEALTH NETWORK, INC.,

               Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 15-2922 (JBS/AMD)

**OPINION**

APPEARANCES:

David Mikel Koller, Esq.
KOLLER LAW PC
2043 Locust Street, Suite 1B
Philadelphia, PA 19103
    Attorney for Plaintiff

Michael J. Wietrzychowski, Esq.
SCHNADER HARRISON SEGAL & LEWIS LLP
220 Lake Drive East, Suite 200
Cherry Hill, NJ 08002
    -and-
Edward Justin Sholinsky, Esq.
Emily Joan Hanlon, Esq.
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
    Attorneys for Defendant

**SIMANDLE, District Judge:**

## I.    INTRODUCTION

Plaintiff Eunice Jenkins ("Plaintiff") filed this law suit against her previous employer, Inspira Health Network, Inc. ("Defendant"), alleging race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000 et. seq. ("Title VII), and the New Jersey Law
Against Discrimination ("NJLAD").

Before the Court is Defendant's motion for summary judgment
on all claims pursuant to Fed. R. Civ. P. 56. [Docket Item 29.]
Plaintiff opposes the motion [Docket Item 34], and Defendant has
submitted a reply brief. [Docket Item 36.] The principal issues
presented by Defendant's motion are: (1) whether Plaintiff's
termination occurred under circumstances that gave rise to an
inference of discrimination, as required to establish a *prima
facie* case of discrimination under Title VII and NJLAD; and, (2)
whether the requisite causal connection of Plaintiff's protected
activity to her termination exists as required to establish
retaliation under Title VII and NJLAD. For the reasons that
follow, the Court finds there are no genuine disputes of
material fact and that Plaintiff failed to demonstrate any
discriminatory or retaliatory animus behind her termination.
Accordingly, the Court will grant Defendant's motion.

## II.  BACKROUND[1]

The Court begins with an examination of the factual record
in this action. Defendant hired Plaintiff, an African American
woman, as a staff registered nurse ("RN"). (SMF ¶ 1.) Plaintiff

---

[1] All facts, unless otherwise stated, are undisputed facts taken
from Defendant's Statement of Material Facts Not in Dispute
("SMF"). [Docket Item 29-2.]

worked for Defendant from August 2007 to February 2014. (SMF ¶ 1.) Defendant initially employed Plaintiff as a staff nurse at one of its inpatient hospice units. (SMF ¶ 2.) Plaintiff was later transferred to an "in the field" position, providing hospice home care. (SMF ¶ 2.) Throughout her employment, Health Professionals and Allied Employees ("the Union"), represented Plaintiff. (SMF ¶ 1.)

### A. Plaintiff's Employment Prior to 2011

Between 2007 and 2011, Plaintiff had a number of supervisors, including Jane Speak ("Speak") and Faith Neale ("Neale"). (SMF ¶ 3.) All supervisors were tasked with evaluating the RNs, such as Plaintiff, and regularly conducted annual reviews. (Speak Dep. 19-20: 11-24, 1-13.)

Plaintiff's 2007-2008 annual review "rated Plaintiff as '3' [out of 5] or 'meets expectations.'" (SMF ¶ 17.) In July of 2008, Plaintiff received counseling for excessive absences. (SMF ¶ 18.) Plaintiff's 2008-2009 review similarly exhibited an overall rating of "3," but this time Neale noted that Plaintiff needed to improve the accuracy of her notes and medication orders. (Def. Ex. 9.) In 2009, Plaintiff received verbal counseling, but Plaintiff disputes the specific performance issues that caused it. [Docket Item 33-1 at ¶ 10.]

Plaintiff's job performance, including recordkeeping, productivity, licensure, and service to her patients declined

markedly in 2010. On her next annual report for 2009-2010, Plaintiff received an overall rating of "2" or "Needs Improvement." (SMF ¶ 21.) The report stated that Plaintiff struggled to complete her work and had been failing to provide timely documentation. (SMF ¶ 21.) In April of 2010, Plaintiff "received written counseling for poor work performance," notably Plaintiff's low productivity. (SMF ¶ 24.) Plaintiff argues that the productivity issue was possibly a result of her "very low" census.[2] (Pl. Dep. 122:17-18.) Nevertheless, shortly thereafter Plaintiff was suspended due to an expired CPR certification. (SMF ¶ 25.)

After the suspension, Plaintiff was again counseled for poor work performance in September 2010. (SMF ¶ 26.) This time, the counseling form addressed two complaints made against Plaintiff by patient family members. (SMF ¶ 26.) Plaintiff disputes the complaints and contends "it wasn't just [her]. Other nurses experienced [this]." (Pl. Dep. 129:3-13.) Later, in January and February of 2011, Plaintiff received more counseling based on a doctor's complaint that Plaintiff discharged a patient without informing the doctor, failed to leave behind medication or instructions with the patient, and for continually being late with her Plans of Care ("POC"). (SMF ¶¶ 27, 28.)

---

[2] As used in this Opinion, Plaintiff's "census" refers to the total number of patients she was responsible for.

**B.   Plaintiff's Relationship with Speak During 2011 and Speak's Racial Comments in 2011**

In 2011, Defendant's Human Resources department ("HR") approached Plaintiff regarding an allegation that Speak "had made a remark about African American Employees being 'monkeys.'" (SMF ¶ 36.) A co-worker brought the comment to HR's attention. (Pl. Dep. 27:1-9.) According to Plaintiff, the RNs and healthcare providers had a "communication line" where voice messages were left as a form of communication and accessed using a code. (Id. at 28:18-20; 29:9-12.) Speak left a message on this communication line providing a directive to Plaintiff "because you're the low monkey on the totum pole." (Id. at 28:18-24.) Speak admitted she made this comment, but states "that was made in general. It was not made at [Plaintiff] and it was not in context . . . having anything to do with racial." (Speak Dep. 68:7-14.)

Plaintiff alleges Speak made additional racially-discriminatory comments, such as: that Plaintiff's hair looked like a "brilopad exploded"; "women down south like fried chicken, cornbread, things of that sort"; and "us white girls have to stick together." (SMF ¶ 36.) (Pl. Dep 37:1-7, 17:25-18:1.) Speak denies she made any of these statements. (Speak Dep. 68:1-3.) It is undisputed, however, that in October 2011 Speak saw a photo of Plaintiff from when she was in high school

and said, "oh jeez . . . I remember these. These are called Afro Puffs." (Id. at 32:1-8.)

According to Plaintiff, Speak treated her "differently when it came to documentation." (Pl. Dep. 35:11-14.) Plaintiff felt Speak unjustifiably harassed her with emails about work issues that did not have anything to do with her patients. (Id. at 18:20-25; 19:1-11.) According to Plaintiff, for everyone else, Speak "would just leave a note on the [communication] line and get it done[,] . . . but with me, I was written up every time." (Id. at 20:1-4.) However, Plaintiff was unable to name any specific nurses whom Speak opted not to write up. (Id. at 21:2-8; 21:9-11.) Plaintiff further stated that both Speak and Neale were "discriminatory to [her]" because they excused an LPN, Mary Celeste, from assisting Plaintiff with a procedure the LPN performed for Caucasian RNs, such as Debbie Miller and BJ Bates. (Id. at 25:8-25 to 26:1-3.)

## C. Plaintiff's Complaint to HR and Her Employment After Speak's Departure

On June 22, 2011, Speak placed Plaintiff on a performance improvement plan ("PIP") "to address her productivity, documentation, and patient care performance issues." (SMF ¶ 30; Pl. Dep. 48:4-9; Def. Ex. 18.) In November 2011, Plaintiff went to Steve Pepper ("Pepper"), who was a member of Defendant's HR staff at the time, to discuss her feelings about "being

6

discriminated against and harassed, and the reasons why." (SMF ¶
40; Pl. Dep. 41:18-20.) Defendant took no action in response to
Plaintiff's complaint about Speak and removed Speak from her
supervisory position in December, 2011, as explained next.
Pepper, acting on behalf of Defendant, "conducted an
investigation into Ms. Speak's comment." (SMF ¶ 38.) Speak was
contacted by Pepper and met with him and another woman from HR
to discuss the incident and "how [Plaintiff] was offended."
(Speak Dep. 39:1-15.) HR explained that Speak should watch what
she says and issued a write up. (Id. at 39:15-19 to 40:1-7.)

Speak testified that any disciplinary action taken after
Plaintiff met with Pepper was purely work-related. (Speak Dep.
45:1-5.) Defendant, meanwhile, maintains that Speak's actions
are mischaracterized because Defendant removed Speak from her
Supervisor position in December 2011. (SMF ¶ 38; Docket Item 37
¶ 16.) To that end, Defendant produced a memo explaining that
Speak's behavior was "in direct violation of the SJH Anti-
Harassment and Non-Discrimination policy." (Def. Ex. 35.)
Defendant disciplined Speak for similar comments on "9/20/10 and
3/21/11," concluded that her "actions contributed to creating a
hostile work environment," and removed Speak from her
supervisory role. (Def. Ex. 35.) Shortly thereafter, Speak left
employment with Defendant in January 2012. [Docket Item 37 ¶ 16;
Def. Ex 38.] Neale took over Speak's team, temporarily managing

both teams, including Plaintiff's. (Speak dep. 79:14-21; Pepper Dep. 18:1.)

Jennifer Slotwinski ("Slotwinski"), a Caucasian woman, became Plaintiff's direct supervisor in February of 2012 when she took over Neale's management of Plaintiff's team. (Speak. Dep. 79:3-8); (Pl. Dep. 166:10-25.) Subsequently, Neale became the Director of Hospice, another supervisory role. [Docket Item 33 at ¶ 4]; (SMF ¶ 51.) Although Plaintiff states Slotwinski did not harass Plaintiff, nor have any racial bias towards her, Plaintiff alleges that Slotwinski told Plaintiff she had been instructed to "find something on her". (Pl. Dep. 163:20-25 to 164:1-7.) According to Plaintiff, this was in a meeting with herself and Pepper. (Id. at 162:7-11.)

Meanwhile, Plaintiff's job performance declined in 2012. Neale wrote Plaintiff up in September 2012 regarding multiple patient care complaints concerning the quality of Plaintiff's service. (SMF ¶ 52; Def. Ex. 24.) Plaintiff disputes the reasons for the write up and claims Neale's actions at this time were retaliatory. [Docket Item 33-1 at ¶ 52.] In support of this claim, Plaintiff proffers she "was called into a meeting at least once a week. There were times that [she] was questioned about [her] behavior and it had to be taken out of [her] chart because it was nonsense so to speak." (Pl. Dep. 57:18-21.)

Plaintiff also documented this allegation in writing on her counselling form. (Def. Ex. 24.)

On January 23, 2013, Plaintiff complained to HR that Neale retaliated against her based-on Plaintiff's complaints about Speak. (SMF ¶ 41.) In her letter, Plaintiff alleged she was subjected to continuous retaliation starting in 2011. (Pl. Dep. 70:19-24.) According to Plaintiff, Neale made no racial comments towards Plaintiff; instead, Plaintiff linked Neale's retaliation to Plaintiff's complaint against Speak because Neale "didn't show that type of behavior towards [Plaintiff] until after [Speak] left." (Id. at 72:1-9.)

Pepper investigated the alleged retaliation and conducted multiple interviews with Plaintiff. (SMF ¶ 41-42.) He contacted Plaintiff after receipt of her letter and proceeded to have conversations with managers and other employees, which Plaintiff requested. (Pepper Dep. 18:13-16; SMF ¶ 42.) According to Pepper, Neale and the other employees expressed concern with Plaintiff's work performance, and he denied the reason behind any of these issues was unfair treatment. (Pepper Dep. 19:9-17; SMF ¶ 42.) Ultimately, Pepper came to the conclusion that "the allegations were not substantiated." (Pepper Dep. 21:14-16.)

Plaintiff also alleges "she was subject to discriminatory treatment because other nurses with the same performance issues as Plaintiff had were not disciplined for those issues," and

that Defendant's response to her late POCs was "more harsh."
(SMF ¶ 43; Pl. Dep. 73:16-17.) In this context, Plaintiff refers
to two employees, Debbie Miller and Mary Jane Stephenson
("Stephenson"), both of whom were RNs, but did not identify
these other employees to Pepper when she complained of
retaliation. (Pl. Dep. 73:9-12; 78:13-16.) Plaintiff does not
dispute that Defendant terminated Stephenson "for performance
issues," on the grounds that she has no sufficient knowledge of
the matter. (SMF ¶ 46; Docket Item 33 at ¶ 46.)

On January 31, 2013, "Plaintiff's supervisors suspended her
for discharging a patient from hospice without the order of a
doctor or the Hospice medical director." (SMF ¶ 55.) Plaintiff
disputes the suspension on the basis that the doctor was, in
fact, notified because Plaintiff called his office directly.
(Pl. Dep. 160:1-7.)

Slotwinski completed Plaintiff's 2012-2013 annual review,
giving Plaintiff a "1" or unsatisfactory. (SMF ¶ 56.) Plaintiff
does not dispute the contents of the written document, which
concludes Plaintiff "had improved the timeliness of her
paperwork" but noted "Plaintiff needs to show improvement in her
visit notes, admission documentation and IDT meeting notes,
specifically in timeliness, quality, and quantity." (SMF ¶ 56;
Def. Ex. 25.) Plaintiff disagreed with the findings of the
review, to the extent that Slotwinski was "writing this based on

what [had] already been written" in the past about Plaintiff, as documented in her employee file. (Pl. Dep. 166:1-14.)

On July 9, 2013, Slotwinski verbally counseled Plaintiff for failing to provide required forms to a transfer patient. (Def. Ex. 26.) Plaintiff disagreed with this allegation, stating that she did not think Slotwinkski was retaliating against her, but believed Slotwinski was "misinformed" by another supervisor, BJ Bates. (SMF ¶ 56; Pl. Dep. 168:11-13.) Plaintiff (who was on Team A) wrote her objection on the counselling form stating: "This was an A team patient. B team does not have access to A team patients unless downloaded and sent from hospice office." Def. Ex. 26). Plaintiff did not think that Slotwinski was retaliating against her. (SMF ¶ 57.)

In August 2013, Slotwinski placed Plaintiff on another PIP, noting Plaintiff needed improvement with productivity, patient notes, and teamwork. (SMF ¶ 59; Def. Ex. 27, 28.) However, Plaintiff felt the PIP was inappropriate because of her low census and because it was repetitive in addressing Plaintiff's previous write-ups. (Pl. Dep. 171:2-16; 172:21-25.) "During the 30-day review for the [PIP] . . . Plaintiff continue[d] to struggle with low productivity. (SMF ¶ 61; Def. Ex. 29.) However, the review also noted that Plaintiff improved in the timeliness of her visit notes, and with her admission of paperwork and notes. (Def. Ex. 29.) Plaintiff also volunteered

for late admissions and fill in work; Plaintiff stated the review showed improvement but she still continued with the plan. (Pl. Dep. 174:11-22.)

**D. Plaintiff's Employment Under Yvonne Elsey After October, 2013**

In late 2013, Yvonne Elsey ("Elsey"), an African American woman, became Director of Hospice for Defendant. [Docket Item 33 at ¶ 1]; (SMF ¶ 51.) In this role, Elsey was responsible for supervising the staff (SMF ¶ 51), and was Plaintiff's direct supervisor from October 11, 2013 through February 17, 2014, when Plaintiff was terminated. [Docket Item 33 at ¶ 3.] Plaintiff testified that Elsey never showed racial bias or said anything racially offensive to her. (Pl. Dep. 178:10-21.) Upon beginning her job, Elsey testified that she did not review employee personnel files, and she did not know Plaintiff's previous supervisors. (SMF ¶ 6; Elsey Dep. 29:14-17; 66:7-15.)

During this time, Slotwinski continued Plaintiff's PIP. (SMF ¶ 61; Def. Ex. 29.) After her 60-day review recorded on October 31, 2013, Slotwinski noted improvement with no patient complaints, but continued Plaintiff's PIP after finding that there was still room for more improvement. (SMF ¶ 62; Def. Ex. 30.)

Before conducting a performance review of Plaintiff, Elsey looked back at Plaintiff's personnel file to see her prior

performance. (Elsey Dep. 30:1-14.) According to Elsey, she would do this for all employees before a review. (Id. at 32:6-11.) Elsey also recalled that, during the time Elsey oversaw Plaintiff, there were many complaints made about Plaintiff. (Id. at 34:6-7.) For example, there were 93 occurrences of late documentation. (Id. at 50:8-15.) Elsey further testified that she had experience with another nurse who was to be terminated for similar late documentation. (Id. at 50:16-23.)

On January 30, 2014, Plaintiff documented that a patient was pending death but did not visit the patient the next day. (Elsey Dep. 58:3-11.) Elsey met with Plaintiff to discuss the allegations that she did not visit this patient who was "pending death" or put the patient on the weekend schedule, as per Defendant's policy. (Id. at 58:3-24 to 59:1-7.) According to Elsey, Plaintiff argued that other nurses were not making these types of visits either. (Id. at 59:2-7.) Elsey testified that, in response to Plaintiff's claims, she called three nurses in the presence of Plaintiff to ask them about their view of Defendant's policy on actively-dying patients, and they all "said exactly what [Elsey] said." (Id. at 59:8-23.)

Elsey also testified that Plaintiff expressed belief "that people were acting on behalf of the devil," and would "couch things in racial discrimination" during meetings about certain concerns. (Id. at 61:16-24 to 62:1.) Elsey did not recall

Plaintiff saying that her thoughts had anything to do with any complaint. (Id. at 63:7-9.) Elsey stated that she did not respond to the allegations because "that would be an HR nightmare," Plaintiff only "sputtered things under her breath." (Id. at 62:12-13.) According to Elsey, she did not want Plaintiff "to deflect and redirect" from the real issues at hand. (Id. at 63:20-24; 62:1-2.)

According to Plaintiff, Elsey was aware of Plaintiff's concerns with retaliation and told her "we're going to start with a clean slate, which wasn't the case." (Pl Dep. 180:6-12.) Plaintiff believes Elsey was, in fact, considering all of the previous allegations from Neale and Speak, described supra, in making her decisions. (Id. at 179:6-9.)

On February 3, 2014, a family friend of one of Plaintiff's patients called Defendant, "concerned about the care Plaintiff provided." (SMF ¶ 63.) The family friend discussed an incident where Plaintiff did not leave the family with a "comfort kit," which typically contains drugs for pain and other conditions. (SMF ¶ 63.) Consequently, a family member had to leave the patient's side to go purchase the required drugs. (SMF ¶ 63; Def. Ex. 31.)

Defendant "suspended Plaintiff on February, 7, 2014, while it investigated" the matter. (SMF ¶ 65.) The caller additionally alleged that "Plaintiff did not touch the patient and did not

take her vital signs." (SMF ¶ 63; Def. Ex. 31.) The patient's sister, also a nurse for Defendant, sent Defendant a three-page letter dated February 17, 2014, explaining her specific worries. (SMF ¶ 64; Def. Ex. 32).

Plaintiff, on the other hand, lacks any knowledge of this call and did not view any documentation occurring after her termination. (Pl. Dep. 184:18-22.) Furthermore, Plaintiff states that she made a judgment call with respect to the comfort care kit and explained that the patient's daughter informed her that the son would pick up the medication, otherwise Plaintiff "would have been glad" to pick one up. (Pl. Dep. 183:11-17.)

On February 10, 2013, while Plaintiff was suspended, Roberta Flores, another one of Plaintiff's direct supervisors at the time, "emailed . . . Elsey with another patient complaint." (SMF ¶ 66.) According to the email, this patient's daughter had complained that Plaintiff failed to attend scheduled visits. (Def. Ex. 34.)

### E. Plaintiff's Termination

Defendant terminated Plaintiff on February 17, 2014. (SMF ¶ 67.) Elsey met several times with Plaintiff to discuss her termination. (Elsey Dep. 51:15-17.)

According to Pepper, Plaintiff's termination occurred as follows. "[T]he manager typically would come with a concern in regards to performance, behavior and would recommend a course of

action," and then review the manager's concerns to see "if
termination is warranted." (Pepper Dep. 9:1-9.) According to
Pepper, the ultimate decision to terminate is the manager's
decision. (Id. at 9:12.) Still, he could not recall an instance
where he recommended against termination and Management went
against that recommendation. (Id. at 10:6-10.) He specifically
states that he and the HR team would review the "Description of
Current Infraction," and that, in this instance, it was Elsey's
decision to terminate Plaintiff. (Id. at 25:11-13; 29:14:23.)
Elsey stated in her Deposition, she agreed with the decision to
terminate Plaintiff, but that she "was not empowered to make
that decision without it going through a review board." (Elsey
Dep. 22:22-24 to 23:1-2.)

    According to Elsey, Pepper was the "HR business partner"
and served as a consultant "to advise and guide [Elsey]."
(Pepper Dep. 23:12-19.) Pepper never mentioned Plaintiff's 2013
complaint. (Id. at 25:14-19; Elsey Dep. 68:7-12.) Elsey thought
Plaintiff had not provided "quality service," recorded
"information that did not appear to be accurate," and "created a
lot of grief and angst" for patients, their families, and
doctors. (Elsey Dep. 24 6-18.) Elsey's opinion that Defendant
should terminate Plaintiff was based on "[s]ome PIPs for
[Plaintiff], that she didn't respond to in terms of change,
related to patient care, patient complaints, and activity that

was outside of the conditions of participation for any hospice nurse that was case managing," all in addition to low productivity. (Id. at 20:13-24.)

Pepper stated the termination was "[b]ased on the number of different individuals who had supervised [Plaintiff] and based on a number of their concerns, which were consistent with what [Elsey's] perspective was. (Pepper Dep. 31:14-18.) According to Pepper, Elsey "was fairly new at the time and was really a brand-new addition to the team, so she really had an unbiased opinion." (Id. at 31:18-23.)

Plaintiff contested her termination, stating in writing that she "firmly disagree[d] with the occurrences" that detailed her termination. [Docket Item 33 at ¶ 69.] Plaintiff "filed a grievance with [Defendant] after her termination." (SMF ¶ 14.) A grievance meeting was held on May 13, 2014, where Plaintiff expressed her view that the termination was unfair. (Pl. Dep. 192:1-22.) In response to the "comfort care incident" (one of the alleged reasons for her termination), Plaintiff filed a "grievance" on the basis that "it was a hectic weekend" and that she merely "overlooked ordering the comfort kit." (Id. at 193:1-6.) Plaintiff testified she "would never say that." (Id. at 193:12-19.) "[Defendant] denied the grievance." (SMF ¶ 14.) After the termination, Slotwinski wrote Plaintiff a positive

letter of recommendation. (Pl. Ex. D, Jenkins007; Docket Item 33 at ¶ 70.]

The EEOC issued and mailed to Plaintiff a Notice of Right to Sue on January 23, 2015. [Docket Item 1-2.] Plaintiff filed this Complaint on April 24, 2015 [Docket Item 1.] After conclusion of discovery, Defendant moved for summary judgment [Docket Item 29], to which the Court now turns.

### III. STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the

matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the factfinder, and thus at the summary judgment stage credibility issues should be resolved against the moving party. Big Apple BMW v, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992); Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, "[t]he mere existence of a scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Anderson, 477 U.S. at 252. In the face of such evidence, summary judgment is still appropriate "[w]here the record ... could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

### A. Plaintiff's Racial Discrimination Claim

#### 1. Plaintiff's prima facie case

Defendant first argues that Plaintiff cannot establish the prima facie case for racial discrimination under Title VII or NJLAD because there is no evidence she was replaced by an employee of another race or any other circumstances giving rise to an inference of discrimination. [Docket Item 29 at 6.] Based on the record presented by the parties, the Court agrees.

Title VII provides, in pertinent part, that it shall be unlawful for an employer:

> (1) to fail or refuse to hire or to discharge any
> individual, or otherwise to discriminate against any
> individual with respect to his compensation, terms,
> conditions, or privileges of employment, because of such
> individual's race, color, religion, sex, or national
> origin.

42 U.S.C. § 2000e-2. Under Title VII, the <u>McDonnell Douglas</u> burden-shifting paradigm governs the Court's analysis. <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-03 (1974); <u>see also</u> <u>Scheidemantle v. Slippery Rock State System of Higher Educ.</u>, 470 F. 3d 535, 539 (3d Cir. 2006). Courts evaluate motions for summary judgment on NJLAD claims under the same burden-shifting regime. <u>Ewell v. NBA Properties, Inc.</u>, 94 F. Supp. 3d 612, 620 (D.N.J. 2015)

To prevail under this framework, a plaintiff has the initial burden of showing a prima facie case for racial discrimination. The plaintiff must demonstrate: (1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances that gave rise to an inference of discrimination. <u>Jones v. Sch. Dist. Of Philadelphia</u>, 198 F.3d 403, 412 (3d Cir. 1999). A plaintiff may establish the fourth element and show an inference of discrimination through: "evidence of comparators . . . or [by] rely[ing] on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action. <u>Greene v. Virgin Islands Water &</u>

<u>Power Auth.</u>, 557 Fed. App'x 189, 195 (3d Cir. 2014) (citing

<u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797 n.7 (3d Cir.

2003)).

Plaintiff has not satisfied the fourth element here.

Initially, the Court notes that Plaintiff does not allege that

before, during, or after her termination Defendant sought to

hire any similarly-qualified individuals who do not belong to

Plaintiff's protected class. Plaintiff in fact provided no

evidence Defendant actually replaced her with a person of a

different race. From the current record, the Court is unable to

discern if Defendant even filled Plaintiff's position after she

was terminated in 2014.

To be sure, Plaintiff may introduce evidence of

"comparators" by showing that "similarly situated employees of a

different race received more lenient treatment than that

afforded plaintiff." <u>Ewell</u>, 94 F. Supp. 3d at 624. In

determining whether employees are similarly situated, the Third

Circuit has adopted that comparators "must be similarly situated

in all relevant respects." <u>Wilcher v. Postmaster Gen.</u>, 441 Fed.

App'x 879, 882 (3d. Cir. 2011). Specifically, courts may

consider "whether the plaintiff and the comparator had similar

job responsibilities, were subject to the same standards, worked

for the same supervisors, and engaged in comparable misconduct."

*Ewell*, 94 F. Supp. 3d at 624 (citing *Wilcher*, 441 Fed. App'x at 882).

Here, Plaintiff names three similarly-situated Caucasian employees who she claims Defendant treated more leniently, Debbie Miller, BJ Bates, and Stephenson. (Pl. Dep. 73:9-12; 78:13-16.) Each of the three RNs was subject to Speak's or Neale's supervision during the relevant time period and was, therefore, subject to the same standards and similar job responsibilities as Plaintiff. (SMF ¶ 4.)

Plaintiff testified that Debbie Miller's POCs were also late, but only Plaintiff was written up and was treated "more harsh . . . because [she] received direct e-mails." (Pl. Dep. 73:20-24; Pl. Ex. E.) Plaintiff contends that, usually, the supervisor "would just leave a note on the line and get it done . . . but with me, I was written up every time." (Pl. Dep. 20:1-4). Additionally, Plaintiff's supervisors excused an LPN, Mary Celeste, from performing a procedure for Plaintiff that the LPN performed for Caucasian RNs, such as Debbie Miller and BJ Bates. (Pl. Dep. 25:8-25 to 26:1-3.)

Although Plaintiff states that she witnessed other nurses filing paperwork that was more than two weeks overdue, she does not allege that any RN was late on their paperwork to the extent that she was. (Id. at 23:9-18, 21:9-11.) Plaintiff failed to timely document her visits ninety-three times, despite having

22

"fewer patients than any other hospice nurse." [Docket Item 36 at 4] (emphasis in original). When asked to point to another RN who had failed to timely document that many visits, Plaintiff could not provide any specific names. (Pl. Dep. 21:2-11, 23:9-18.) Plaintiff later testified, "I don't know who has late documentation and what the numbers are. I just know that my census was the lowest." (Id. at 183:1-3.)

During the five months Elsey supervised Plaintiff, Plaintiff completed 104 unauthorized visits. [Docket Item 36 at 4.] Elsey testified that she did not know of other nurses who had made any unauthorized visits, such as Plaintiff, nor was she aware of anyone with the same amount of late documentation as Plaintiff. (Elsey Dep. 48:7-16; 50:1-22.)

In violation of Defendant's policy, Plaintiff also failed to visit at least one actively-dying patient. (Id. at 58:3-24 to 59:1-7.) When she met with Elsey to discuss the incident, Plaintiff contended that other nurses were failing to do the same. (Id. at 59:2-7.) Yet, when Elsey called three different nurses in Plaintiff's presence, each nurse stated the correct policy on actively-dying patients and denied that they failed to visit any actively-dying patients. (Id. at 59:8-23.)

According to Defendant, similarly-situated Caucasian employees who engaged in misconduct were, in fact, treated the same as Plaintiff. For example, Defendant terminated Stephenson,

a Caucasian RN, over the same type of performance-related issues to those documented in Plaintiff's case. (SMF ¶ 46.)

Moreover, Plaintiff does not succeed in establishing an inference of discrimination by pointing to Speak's comments from 2011. Notwithstanding these comments, Defendant actually reprimanded Speak for these comments in December 2011 and removed her from supervision. (Def. Ex. 35.) Speak's employment with Defendant was ultimately terminated in January 2012 (nearly three years before Elsey recommended that Plaintiff be terminated in 2014). [Def. Ex 38] Simply, Speak was not the decision maker in Plaintiff's termination, was not involved in any way in the process, and made remarks "temporally remote from the date of decision," see Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992). Accordingly, the 2011 comments do not create an inference of discrimination in connection with the adverse employment action (i.e., Plaintiff's termination).

Plaintiff provides no evidentiary support for the position that Caucasian employees engaged in misconduct comparable to that which Plaintiff engaged in or that these other employees were not similarly reprimanded for such misconduct. This is especially so when a Caucasian RN, Stephenson, was in fact terminated by Defendant for similar misconduct. Therefore, Plaintiff has not established the prima facie case for race

discrimination under Title VII or NJLAD, and as such, summary judgment will be granted.

### 2. Defendant's proffered legitimate reasons for Plaintiff's adverse employment actions

Defendant argues that even if Plaintiff were able to make her prima facie case, she cannot prove Defendant's proffered reason for disciplining, suspending, and terminating Plaintiff was pretextual. [Docket Item 29 at 9.] Again, the Court finds there is no factual basis on which a reasonable fact finder could find that the Defendant's stated reasons of poor job performance were pretextual.

Even if the Court were to assume Plaintiff could establish a prima facie case of discrimination against Defendant, Plaintiff simply cannot establish that the proffered legitimate non-discriminatory reason for her termination (i.e., "her poor performance between October 2013 and February 2014") was pretextual as required under the McDonnell Douglass framework. See McDonnell Douglas, 411 U.S. at 804; Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).

Defendant has undoubtedly provided a legitimate, non-discriminatory rationale for terminating Plaintiff. Specifically, Defendant offers that it fired Plaintiff for recording patient's vitals without actually taking them, for missing 125 patient visits, for making 104 unauthorized visits,

for failing to document 93 visits timely, low productivity, serious patient complaints, and failure to visit actively-dying patients as required by Defendant's policy. [Docket Item 36 at 4.] Defendant also provides records with specific dates of Plaintiff's alleged misconduct and subsequent paperwork. [Docket Item 29 at 12-13; Def. Ex. 5, 28-34.]

Under the McDonnell Douglas framework, when a defendant offers a legitimate nondiscriminatory reason for its employment action at the summary judgment stage, "plaintiff generally must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 762.

The ultimate issue remains whether discriminatory animus motivated the employer. Thus, to show pretext under the first prong, the Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Jones, 198 F.3d at 413. Under the second prong, Plaintiff may point to evidence that the

"employer has previously discriminated against [the plaintiff],
that the employer has previously discriminated against other
persons within the plaintiff's protected class, or that the
employer has treated more favorably similarly situated persons
not within the protected class." Simpson v, Kay Jewelers, Div.
of Sterling, Inc., 142 F.3d 639, 645 (citing Fuentes, 32 F.3d at
765).

Plaintiff simply has not presented any evidence that could
persuade a reasonable jury that Defendant's rationale was merely
pretext and that its employment decisions were actually based on
Plaintiff's race, as discussed above. Accordingly, and for the
reasons described above, summary judgment will be granted as to
the Plaintiff's racial discrimination claim.

**B. Plaintiff's Retaliation Claim**

Defendant argues that Plaintiff fails to make the prima
facie case for her retaliation claim because she cannot adduce
facts from which a jury could reasonably find the requisite
causal connection between her participation in protected
activity under Title VII and her termination. [Docket Item 29 at
15.]

Title VII protects employees who attempt to exercise rights
guaranteed by Title VII against retaliation by employees. 42
U.S.C. § 2000e-3(a). Protected activities include making a
charge of employment discrimination, assisting in an

investigation of such a charge, or filing an EEOC complaint, as examples, as well as informal but specific complaints to management of discriminatory employment practices. See Crawford v. Metropolitan Gov't of Nashville & Davidson City., Tenn., 555 U.S. 271, 277 (2009); Moore v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006) (citations omitted). Thus, a cause of action for Title VII retaliation lies whenever the employer responds to protected activity in such a way "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal citations and quotation marks omitted).

Plaintiff has the burden of proving a causal connection between her Title VII protected activity and her termination. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000). A short time period may be especially suggestive of a causal link, Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (discharge of plaintiff two days after filing EEOC complaint), while even a more extended passage of time is not conclusive against a causal link if, for instance, the intervening period is marked by antagonistic conduct against the

employee, see Farrell, 206 F.3d at 280-81; Woodson v. Scott
Paper Co., 109 F.3d 913, 921 (3d Cir. 1997).

Retaliation claims under the NJLAD are analyzed according
to the same McDonnell Douglas burden-shifting framework applied
to Title VII retaliation claims. Campbell v. Supreme Court of
New Jersey, No. 11-555, 2012 WL 1033308, at *17 (D.N.J. Mar. 27,
2012) (citing Davis v. City of Newark, 285 Fed. App'x 899, 903
(3d Cir. 2008). Title VII's opposition clause makes it "unlawful
. . . for an employer to discriminate against any . . .
employe[e] . . . because he has opposed any practice made . . .
unlawful . . . by this subchapter." U.S.C. § 2000e-3(a).

Plaintiff establishes a prima facie case of retaliation by
showing that: "(1) she engaged in activity protected by Title
VII; (2) the employer took an adverse employment action against
her; and (3) there was a causal connection between her
participation in the protected activity and the adverse
employment action." Moore, 461 F.3d at 340-41. "The plaintiff's
ultimate burden in a retaliation case is to convince the
factfinder that retaliatory intent had a determinative effect on
the employer's decision." Cortes v. Univ. of Med. and Dentistry
of N.J., 391 F. Supp. 2d 298, 312 (D.N.J. 2005).

In regard to protected activity, "the anti-retaliation
provision of Title VII protects those who participate in certain
Title VII proceedings (the 'participation clause') and those who

29

oppose discrimination made unlawful by Title VII (the 'opposition clause')." Moore, 461 F.3d at 341. Thus, an employee engages in protected activity when the employee participates in formal or "informal protests of discriminatory employment practices, including making complaints to management." Id. at 343 (quoting Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)).

Plaintiff participated in Defendant's investigation into Speak's remark in 2011. [Docket Item 29 at 15.] Plaintiff also filed her own complaint of discrimination with HR in November 2011 (SMF ¶ 40; Pl. Dep. 41:18-20), and again on January 23, 2013, concerning retaliation. (SMF ¶ 41; Pl. Dep. 70:19-24.) In 2013, Plaintiff wrote a letter alleging she was subjected to continuous retaliation. (Pl. Dep. 70:19-24; Pl. Ex. D, Jenkins0045.) The Court views all of these actions as "protected activity" for purposes of Plaintiff's retaliation claim. With that said, the Court agrees with Defendant's argument that, assuming she engaged in protected activity, "Plaintiff cannot point to any evidence that her disciplines and termination were related to her participation" in these investigations. [Docket Item 29 at 15.] In other words, the Court finds that there is no evidence to support a causal connection between the protected activity in which Plaintiff engaged, at the latest, in January

2013, and her termination more than one year later, in February 2014.

According to the Third Circuit, at the summary judgment stage "a broad array of evidence" is considered in deciding whether a causal link exists. See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000). "The mere fact that [an adverse action] occurs subsequent to the lodging of a complaint is ordinarily insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." Chambers v. Heidelberg USA, Inc., No. 04-583, 2006 WL 1281308, at *11 (D.N.J. May 5, 2006). While a short period of time separating an employee's protected activity and an adverse employment decision "may provide an evidentiary basis from which an inference of retaliation can be drawn," temporal proximity that is not "unusually suggestive," prompts the question, "whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005); LeBoon, 503 F.3d at 232 (quoting Farrell, 206 F.3d at 280).

Plaintiff may provide evidence of intervening antagonism, retaliatory animus, inconsistencies in Defendant's proffered non-discriminatory reasons for termination or any evidence suffice to support an inference of retaliatory animus. See

LeBoon, 503 F.3d at 232. "The mere fact that [an adverse action] occurs subsequent to the lodging of a complaint is ordinarily insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." Chambers v. Heidelberg USA, Inc., No. 04-583, 2006 WL 1281308, at *11 (D.N.J. May 5, 2006).

Here, the temporal proximity of Plaintiff's most recent complaint in January 2013 took place more than one year before her termination in February 2014. Thus, it does not rise to the "very close" temporal proximity that may establish a prima facie case alone. See Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001); see also LeBoon, 503 F.3d at 232 (holding "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment"). Therefore, the issue is whether a reasonable fact-finder could determine Plaintiff's termination was actually caused by her complaint, given the rest of the record before the Court. The Court has determined that no reasonable juror could so find.

Plaintiff asserts that she participated in some "protected activity" in 2014 during meetings with her supervisor, Elsey. As evidence, Plaintiff refers to Elsey's testimony that Plaintiff "couched things in racial discrimination." [Elsey Dep. 61:16-

24.] Plaintiff further highlights that Elsey admitted she did not respond to Plaintiff's allegations because it "would be an HR nightmare." (Id. at 62:1-2.) It is unclear from the record that any statements Plaintiff made to Elsey were, in fact, a "complaint," as Plaintiff merely "sputtered things under her breath." (Elsey Dep. 62:12-13.) There is likewise no evidence that Plaintiff conveyed oral complaints of racial discrimination in employment for which she sought Defendant's investigation or assistance. And Plaintiff supplies no other evidence that she raised concerns of racial discrimination with Elsey or anyone else in 2014. Assuming it occurred, such generalized grumbling does not amount to a complaint of racial discrimination or participation in an investigation thereof in 2014.

To the extent that this action provides any inference of retaliatory animus, the record provides no further evidence of whether the context of Plaintiff's comments to Elsey dealt with any complaints of retaliation or involved any new allegations. Elsey never met or spoke with Plaintiff's previous supervisors, including Speak and Neale. (SMF ¶ 6; Elsey Dep. 29:14-17; 66:7-15.) Both Neale and Speak were no longer working for Defendant by the time Elsey was hired. (Def. Ex. 28, 23.) During the firing process, Pepper, who was aware of the complaints, never discussed them with Elsey. (Pepper Dep. 25:14-19; Elsey Dep. 68:7-12.) Thus, "[i]t is not reasonable for a factfinder to

infer that an employer's reaction was motivated by an intent to retaliate for conduct of which the employer's decisionmaker was not aware. Nor is it a fair." <u>Moore</u>, 461 F.3d at 351-52.

Even assuming, as Plaintiff suggests, that "it can be reasonably inferred from all of [the] testimony that, whether Elsey was the decision-maker, Pepper was the decision-maker, or some other individual or group was the decision-maker, that whoever was the decision-maker knew about Plaintiff's complaints, and that the decision to terminate Plaintiff was because of her complaints," Plaintiff does not provide evidence of inconsistency or incongruity in Defendant's reasons for termination in order to establish genuine issue of material fact. [Docket Item 34 at 7.]

Elsey specifically stated that her reasons Defendant should terminate plaintiff included: "PIPs for [Plaintiff], that she didn't respond to in terms of change, related to patient care, patient complaints, and activity that was outside of the conditions of participation for any hospice nurse that was case managing," in addition to low productivity. (Elsey Dep. 20:13-24.) Elsey thought Plaintiff had not provided "quality service," and Plaintiff recorded "information that did not appear to be accurate" and "created a lot of grief and angst" for patients, their families, and doctors. (<u>Id.</u> at 24:6-18.) During the five months Elsey oversaw Plaintiff, there was 93 occurrences of late

documentation alone, despite any previous issues with Plaintiff's performance prior. (Id. at 50:8-15.) If there are 100 workdays in 5 months, Plaintiff's rate of late documentation was essentially daily, as were her rates of missing patient visits (125) and making unauthorized visits (104), which is an astonishing and uncontradicted level of poor job performance.

Aside from Elsey's own reasoning and observations, it is noteworthy that the record provides extensive documented evidence of Plaintiff's poor work performance and patient complaints for this time. (Def. Ex. 28-34.) This includes reviews by a different supervisor, Slotwinsky, whom Plaintiff does not allege harassed or retaliated against her. (Pl. Dep. 163:20-25 to 164:1-7; 168:11-13; SMF ¶ 56.)

Plaintiff argues that the disciplinary actions and notices under Elsey were a "continuum of what [Neale] has written, and what [Speak] had written." (Pl. Dep. 179:6-9.) But the record reflects new patient complaints and incidents throughout Elsey's tenure as Plaintiff's supervisor. (Def. Ex. 30-34.) Plaintiff believes that failing to supply a family with a comfort pack is the "one specific incident" that was, in fact, recent. (Pl. Dep. 181: 5-12.) As discussed in detail above, that is simply not so.

Plaintiff must point to some evidence from which a jury could reasonably conclude there was a causal connection between her participation in the protected activity and her termination.

See Moore, 461 F.3d at 342. Plaintiff's evidence of her own
narratives disputing her performance and subjective belief she
was a good hospice nurse, does not create a genuine issue of
material fact where her termination was motivated by "continuing
complaints about deficiencies in her performance." El-Sioufi v.
St. Peter's Univ. Hosp., 382 N.J. Super. 145, 174, 887 A.2d
1170, 1187 (App. Div. 2005); see also Hervey v. Cty. of
Koochiching, 527 F.3d 711, 723 (8th Cir. 2008) (where an
employer's action "was a logical consequence of [Plaintiff's]
pre-existing disciplinary problems . . . [Plaintiff] cannot
create a submissible case of unlawful retaliation by
interjecting her announcement of a discrimination claim in the
middle of a previously scheduled meeting"). These deficiencies
were documented and tabulated and amount to overwhelming reasons
to terminate a hospice nurse, and Plaintiff does not take issue
with the tabulations other than to claim, with no support, that
Caucasian nurses were just as bad and suffered no consequences.

Additionally, the documentation of conduct occurring before
any alleged discrimination and retaliation is consistent with
the more recent conduct which resulted in Elsey recommending
that Plaintiff be terminated. (Def. Ex. 7.) Plaintiff may
sincerely disagree with various complaints, opinions of numerous
supervisors, or the business decision made by Defendant. But
without additional factual support from the record, Plaintiff

cannot rebut Defendant's non-discriminatory reasons for termination. <u>See</u> <u>LeBoon</u>, 503 F.3d at 233-34 (finding no sufficient evidence of causal connection where events after the plaintiff's protected activity did not show a "qualitatively different relationship" from the plaintiff's difficulties with her supervisor "almost immediately"). Accordingly, summary judgement will be granted on Plaintiff's retaliation claim.

## V. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment will be granted in full. Plaintiff's claims are hereby dismissed with prejudice. An appropriate Order follows.


**March 28, 2018**                          **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                            U.S. District Judge